THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| COMMISSIONER ERIC WATNESS, as Personal Representative of the Estate of Charleena Lyles; KAREN CLARK, as Guardian Ad Litem on behalf of the decedent's four minor children,<br><br>Appellant,<br><br>v.<br><br>THE CITY OF SEATTLE, a municipality; JASON M. ANDERSON, an individual; STEVEN A. MCNEW, an individual,<br><br>Respondent. | No. 79480-9-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

ANDRUS, A.C.J. — On June 18, 2017, Seattle Police Officers Jason Anderson and Steven McNew (the Officers) shot and killed Charleena Lyles after, as the Officers contend, she threatened them with a knife. Retired Commissioner Eric Watness, personal representative of Lyles's estate, and Karen Clark, guardian ad litem for Lyles' four minor children (referred here jointly as the Estate), sued the City of Seattle (the City) and the Officers alleging negligence and assault. The trial court granted the Officers' motion for summary judgment, denied the Estate's motion for partial summary judgment on certain affirmative defenses, and struck the Estate's three

expert declarations. Because there remain genuine issues of material fact, we reverse and remand for further proceedings consistent with this opinion.

FACTUAL BACKGROUND

In the six months prior to her death, Charleena Lyles called the Seattle Police Department (SPD) twenty-three times. On June 5, 2017, SPD responded to one of Lyles's calls in which she reported she had been the victim of domestic violence at her apartment in an affordable housing complex owned by Solid Ground. Police reports indicate that while officers were in her apartment, Lyles—who was present with her young daughter—"armed herself with a pair of extra long metal shears and was threatening [responding] officers." Lyles reportedly told officers, "Ain't none of y'all leaving here today." Both officers present drew their firearms and commanded her to drop the scissors to the floor. Lyles reportedly yelled, "[A]re you going to shoot me in front of my daughter?" The police reported that Lyles refused to put down the shears even after being repeatedly asked to do so. They told Lyles they were there to help her, not to shoot her.

Additional police officers responded to the scene and reported that during this incident, Lyles made several unusual comments, including wanting to "morph into a wolf" and talking about "cloning her daughter." The police described Lyles making several "unusual religious comments" and accusing the officers of being "devils" and members of the Ku Klux Klan. Officers were ultimately able to convince Lyles to take a seat on her sofa and to drop the scissors.

The police reports further indicate the officers separated Lyles and her young child from the scissors and obtained a phone number for a nearby family member who

- 2 -

arrived at Lyles's apartment shortly thereafter. They then took Lyles into custody. The police learned from Lyles's sister that Lyles had experienced "a recent sudden and rapid decline in her mental health." The police report described Lyles as exhibiting "[d]isorientation/confusion," "[d]isorganized speech/communication," "[d]isorderly/disruptive behavior," and "[b]izarre, unusual behavior." They described her as "[b]elligerent/uncooperative, angry," "[o]ut of touch with reality," and experiencing "[h]allucinations/delusions." The incident led the officers to flag Lyles and her address with an "officer safety caution." The police booked Lyles into jail for harassment but recommended her case be transferred to mental health court.

On the morning of June 18, 2017, Lyles called 911 to report a residential burglary. Lyles informed police that three hours earlier, she had discovered her apartment door open and an Xbox missing. Seattle Police Officer Jason Anderson, on routine patrol, responded to the call and conducted a routine record check on the address. After Officer Anderson noted the officer safety caution associated with Lyles and reviewed the police report of the June 5 incident, he requested back up from another unit. When Officer McNew arrived, the two officers briefly discussed the prior incident. Officer McNew commented they should not let Lyles get behind them or get between the officers and her apartment door.

When the Officers contacted Lyles in her apartment, she was calm and cooperative. Lyles told the Officers she had left her apartment unlocked while she went to the store and returned to find her Xbox or PlayStation taken. She led the Officers down a hall to a back bedroom from which she reported items had been stolen. After returning to the kitchen, the officers noticed two young children playing

in the living room. As Officer Anderson asked Lyles to clarify some information for his report, he glanced up and saw Lyles lunge at him with a knife.[1] Officer Anderson testified that had he not jumped back, Lyles would have stabbed him. He drew his firearm and told Lyles to get back. Officer Anderson testified Lyles was yelling at them but he could not make out what she was saying.

Officer Anderson testified Lyles then turned her attention toward Officer McNew, who was then cornered in her kitchen. Officer McNew asked Officer Anderson to use his stun gun.[2] Officer Anderson responded that he did not have his stun gun.[3] The Officers both testified that Lyles continued to approach them, knife in hand, ignoring their commands to get back. Believing Lyles intended to stab one of them, both Officers repeatedly fired their service firearms at Lyles, killing her.

SPD's investigation into the police shooting revealed that Lyles had a black-handled knife with a four and one-half inch blade in her left jacket pocket and a knife sheath in her right jacket pocket. Police recovered a second knife, with a four-inch blade, near Lyles's apartment door. This knife matched the size and shape of the sheath in Lyles's pocket.

---

[1] Although the Estate refuses to stipulate to the facts as presented by the Officers, it has not presented any evidence to dispute their account of Lyles's actions in her apartment immediately before the shooting. We therefore accept this account as undisputed.

[2] The witnesses use the word "Taser," but we refer to the device generically as a "stun gun." We intend to use the two words interchangeably here.

[3] Officer Anderson was certified to carry and deploy a stun gun. Under Seattle Police Department policy, once certified, a police officer is required to carry his stun gun. Following the shooting, Officer Anderson received a two-day suspension for his failure to carry his stun gun device with him on patrol that day.

The Estate brought this lawsuit alleging common law negligence and assault.[4] The City and the Officers asserted a number of affirmative defenses, including immunity under RCW 4.24.420, qualified immunity, assumption of risk, and discretionary immunity.

The City and Officers moved for summary judgment, principally arguing the Officers owed no legal duty to Lyles under the public duty doctrine and that they were immune from suit under Washington's felony defense statute, RCW 4.24.420. The Estate opposed this motion and moved to dismiss the affirmative defenses of qualified immunity and assumption of risk and the City's discretionary immunity defense, and submitted declarations from three expert witnesses, two in police conduct and practices and one in forensic psychology.

The admissibility of the experts' testimony is a key issue in this appeal. Criminologist Thomas Mauriello opined that the Officers' use of their firearms was unreasonable in light of the circumstances and contrary to SPD policies on de-escalation. Police practices expert D.P. Van Blaricom opined that Lyles's death could have been avoided had Officer Anderson been carrying his SPD-mandated stun gun and used it, rather than his firearm, to subdue Lyles. Criminal psychologist, Dr. Mark Whitehill, opined that Lyles was in a psychotic state during the shooting and did not have the capacity to form the intent to assault the Officers. The Officers moved to strike these declarations as inadmissible under ER 702 and Frye v. U.S., 293 F. 1013 (D.C. Cir 1923). The trial court granted the Officers' motion to strike the expert

---

[4] The suit also alleged a violation of the Washington Law against Discrimination (WLAD) and violation of article I section three of the State Constitution. The trial court granted the Officers' CR 12(b)(6) motion to dismiss the WLAD and constitutional claims and the Estate has not appealed that order.

declarations and granted their summary judgment motion.  It denied the Estate's partial summary judgment motion.  The Estate appeals all three orders.[5]

## ANALYSIS

Appellate courts review a summary judgment order de novo and perform the same inquiry as the trial court.  Borton & Sons, Inc. v. Burbank Properties, LLC, 196 Wn.2d 199, 205, 471 P.3d 871 (2020).  A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  CR 56(c).  We view all facts and reasonable inferences in the light most favorable to the non-moving party.  Owen v. Burlington N. Santa Fe R.R. Co., 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

Although appellate courts generally review a decision to exclude expert witness testimony at trial under an abuse of discretion standard, State v. Arndt, 194 Wn.2d 784, 798, 453 P.3d 696 (2019), the de novo standard of review applies when reviewing trial court evidentiary rulings made in conjunction with a summary judgment motion.  Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998).  We review a trial court's Frye ruling de novo.  Advanced Health Care, Inc. v. Guscott, 173 Wn. App. 857, 871, 295 P.3d 816 (2013).

A. Public Duty Doctrine

The Estate first argues its claims are not barred by the public duty doctrine. The Estate alleges the Officers acted unreasonably and violated SPD policy during

---

[5] The City has a separate summary judgment motion on file but the trial court has stayed further proceedings pending this appeal.

their encounter with Lyles by failing to use nonlethal force. It contends the police officers could have used nonlethal methods, such as a stun gun or a police baton, to disarm Lyles or to subdue her without having to shoot her. The core of its case is that the Officers unreasonably failed to follow police practices on the use of nonlethal weapons calculated to avoid the use of deadly force. We agree that this claim is not barred by the public duty doctrine.

"When the defendant in a negligence action is a governmental entity, the public duty doctrine provides that a plaintiff must show the duty breached was owed to him or her in particular, and was not the breach of an obligation owed to the public in general." Munich v. Skagit Emergency Comm'n Ctr., 175 Wn. 2d 871, 878, 288 P.3d 328 (2012). The recent Supreme Court decision in Beltran-Serrano v. City of Tacoma, 193 Wn.2d 537, 549, 442 P.3d 608 (2019), is dispositive on the inapplicability of the public duty doctrine in this case. In Beltran-Serrano, a Tacoma Police Department officer shot a mentally ill homeless man after the officer approached him about panhandling in the city. Id. at 540-41. When the man, who did not understand English, ran from the officer, she shot him multiple times. Id. Beltran-Serrano brought an action for assault, battery, and negligence, arguing that the officer unreasonably escalated the situation, resulting in Beltran-Serrano's death. Id. at 542.

The City of Tacoma argued the officer owed no duty to Beltran-Serrano under the public duty doctrine. Id. at 542. The Supreme Court disagreed, reasoning that "every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others. . . . This duty applies in the context of law enforcement and encompasses the duty to refrain from directly causing harm to another through

affirmative acts of misfeasance." Id. at 550. The court held that "Beltran-Serrano's negligence claims arise out of Officer Volk's direct interaction with him, not the breach of a generalized public duty." Id. at 551.

As in Beltran-Serrano, the Estate's claims arise out of the Officers' direct interaction with Lyles and not the breach of a generalized public duty. The Officers argue Beltran-Serrano is factually distinguishable because the police officer in that case approached Beltran-Serrano unsolicited, whereas here, Officers Anderson and McNew responded to Lyles's request for police assistance. The Officers suggest the holding in Beltran-Serrano was premised on the fact that Beltran-Serrano had enlisted no help from Officer Volk. But Beltran-Serrano cannot be read so narrowly. The Supreme Court unequivocally held that when a police officer has a direct interaction with a plaintiff, that officer has a duty to act with reasonable care. Id. There is nothing in the case to suggest that this duty only exists when the direct interaction is the result of an unsolicited social contact.

The Officers further argue that they did not owe Lyles a legal duty of care because when they responded to her report of a burglary, she was able to converse with them coherently, she suddenly and without provocation attacked them, and the Officers had the right under RCW 4.24.420 to respond with force. But this argument conflates the concept of whether officers owe a legal duty to exercise reasonable care in interacting with others and whether officers are statutorily immune from civil liability for using lethal force when defending themselves from an assault.

While there are factual differences between this case and Beltran-Serrano, these differences do not negate the holding of that case: an officer owes a legal duty

to exercise reasonable care when engaging in affirmative conduct toward others, whether they be crime victims or individuals suspected of committing crimes. As the Supreme Court indicated in Beltran-Serrano, when "harm result[s] from the officer's direct contact with [a] plaintiff[], [and] not the performance of a general public duty of policing" the public duty doctrine does not apply. Id. at 551. If the officers act, they have a duty to act with reasonable care. Id.

Here, whether the use of lethal force breached a duty of reasonable care is a question for the trier of fact. The Officers may ultimately convince a jury that lethal force was the only viable option. But Beltran-Serrano establishes that the public duty doctrine does not bar the Estate's negligence claim.

B. Felony Defense Statutory Immunity

The Officers next contend they have complete statutory immunity under Washington's felony defense statute, RCW 4.24.420. Because genuine issues of material fact exist regarding the applicability of that statutory immunity, we conclude summary judgment was inappropriate.

RCW 4.24.420 provides:

> It is a complete defense to any action for damages for personal injury or wrongful death that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death and the felony was a proximate cause of the injury or death.

RCW 4.24.420 requires proof that the person killed was engaged in the commission of a felony at the time of her death. The Officers allege that Lyles was engaged in the commission of a felony because her conduct constituted first degree assault with a

deadly weapon under RCW 9A.36.011(1) and attempted murder under RCW 9A.28.020(1) and (3), and RCW 9A.32.[6]

Assault with a deadly weapon requires proof that a person, with the intent to inflict great bodily harm, assaulted another with a deadly weapon. RCW 9A.36.011(1); 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.01, at 480 (4th ed. 2016) (WPIC). As the Estate correctly notes, the mens rea for first degree assault is the specific intent to inflict great bodily harm. State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). Attempted murder requires proof of the specific intent to cause the death of another person. State v. Boswell, 185 Wn. App. 321, 335, 340 P.3d 971 (2014); WPIC 26.01.

To benefit from complete immunity under RCW 4.24.420, the Officers must prove that Lyles formed the specific intent either to inflict great bodily harm or to cause death. The Officers argue they have no burden of proving any specific mens rea. We disagree. In Davis v. King County, No. 79696-8-I, slip op. at 9-10 (Wash. Ct. App. Feb 1, 2021), this court concluded that a defendant asserting immunity under RCW 4.24.420 must prove the party killed formed the intent to commit a felony. In Davis, two King County Sheriff's deputies shot and killed a woman in her home after she allegedly pointed an unloaded gun at them. Id. at 4-5. After Davis's estate brought a wrongful death action, the trial court granted summary judgment for the deputies, ruling that Davis was engaged in the commission of first degree assault when the

---

[6] The Officers do not identify the provision of our homicide statute on which they rely to substantiate this assertion. Chapter 9A.32 RCW includes premeditated murder, murder in the first and second degree, and manslaughter in the first and second degree. All are felonies but each contains a different mens rea, from premeditation and intent, to recklessness and negligence. Because the Officers repeatedly use the word "murder," we assume the Officers are relying on RCW 9A.32.030 (murder in the first degree) or RCW 9A.32.050 (murder in the second degree).

deputies killed her and that RCW 4.24.420 barred the Davis's claims. Id. at 6. This court reversed, concluding that specific intent is an essential element of first degree assault and Davis's history of mental illness, the deputies' conflicting testimonies about the placement of the gun, and Davis's dying statement that the gun was not loaded raised a genuine issue of material fact as to whether Davis had formed the requisite intent to commit assault. Id. at 9-10.[7]

As in Davis, there is a genuine issue of material fact as to Lyles' specific intent to commit assault with a deadly weapon or attempted murder. A person's diminished capacity, due to a mental illness, may impair her ability to form the specific intent to commit a crime. State v. Nuss, 52 Wn. App. 735, 738, 763 P.2d 1249 (1988). Contrary to the Officers' contention, diminished capacity is not an affirmative defense for which a criminally charged defendant bears the burden of proof, but is merely evidence that negates specific intent. Id. at 739. See also WPIC 18.20 (Diminished Capacity – Defense).[8] Generally, a criminally charged defendant must present evidence of a mental disorder and expert testimony must logically and reasonably connect the defendant's alleged mental condition with the asserted inability to form the mental state required for the crime charged when the defendant seeks a

---

[7] The Officers argue Lyles's intent is immaterial under RCW 4.24.420, citing Estate of Lee v. City of Spokane, 101 Wn. App. 158, 177, 2 P.3d 979 (2000). But Lee simply states "[i]t is a complete defense to any action for damages for wrongful death that the person killed was engaged at the time in the commission of a felony and that the felony was a proximate cause of death." Id. Lee contains no discussion of whether the aggressor's mens rea should be considered when adjudicating a defendant's immunity under RCW 4.24.420. Generally, in cases where a legal issue is not discussed in an opinion, the case is not controlling on a future case where the legal issue is properly raised. Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 824, 881 P.2d 986 (1994). Lee does not discuss mens rea under RCW 4.24.420 and is not controlling here.

[8] Diminished capacity is treated as an affirmative defense only to the extent that the defendant carries the burden of producing sufficient evidence of diminished capacity to put the defense in issue. State v. Carter, 31 Wn. App. 572, 575, 643 P.2d 916 (1982).

diminished capacity jury instruction. State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001). When a defendant presents such evidence, a court may instruct the jury that "[e]vidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to form (fill in requisite mental state)." WPIC 18.20. Thus, while the Estate may have the burden to produce evidence that Lyles suffered from a mental illness that diminished her capacity to form the requisite specific intent, the ultimate burden of proving each element of the alleged felonies remains with the Officers.

If a jury were to find, as the Estate contends, that Lyles suffered from a mental disorder that rendered her unable to form the mens rea of a felony, then the jury could conclude the Officers failed to prove she was engaged in the "commission of a felony" and they would not be entitled to statutory immunity under RCW 4.24.420.

Here, the Officers presented prima facie evidence that Lyles committed at least felony assault. They both testified she lunged at them with a knife while making threatening statements. Although the Officers may have no direct evidence of Lyles's intent, a jury may infer it from this circumstantial evidence. "A jury may infer criminal intent from a defendant's conduct where it is plainly indicated as a matter of logical probability. This includes inferring or permissively presuming that a defendant intends the natural and probable consequences of his or her acts." State v. Bea, 162 Wn. App. 570, 579, 254 P.3d 948 (2011) (citations omitted).

The Estate, however, presented evidence that Lyles was suffering from a psychosis at the time of the shooting that impaired her ability to form this mens rea. The police reports of the June 5, 2017 incident describe Lyles as disoriented,

delusional, experiencing hallucinations, and exhibiting impaired judgment. The Officers testified that Lyles's conduct swung rapidly from coherent to aggressive without warning on June 18. Dr. Whitehill testified that Lyles had a history of depression, post-traumatic stress disorder, adjustment disorder and an anxiety disorder, as well as a history of decompensation and emerging psychosis. Dr. Whitehill concluded from his review of the records that "she was in a psychotic state and did not have the capacity to intend to assault [the Officers] when she encountered police on June 18, 2017."

The Estate contends the trial court erred in excluding Dr. Whitehill's declaration. We agree. First, evidence of Lyles's mens rea is relevant under RCW 4.24.420. The Officers must prove each element of the alleged felony, including intent, and evidence of Lyles's incapacity to form intent to commit felonious assault or attempted murder at the time of her shooting relates directly to an element of proof under RCW 4.24.420.

Second, the testimony is admissible under Frye. The Officers contend Dr. Whitehill's methodology, termed a "psychological autopsy," is not generally accepted in Washington. But there is nothing in the record to establish that Dr. Whitehill's "psychological autopsy" methodology is unsound. Dr. Whitehill testified that a psychological autopsy "is an established practice within the field of forensic psychology to determine the mental state of someone who is already deceased." The Officers presented no evidence to contradict this testimony.[9]

---

[9] Other state courts have also approved of the methodology, finding no distinction between psychological autopsies and psychiatric opinion evidence in general. See Jackson v. State, 553 So.2d 719 (Fla. Dist. Ct. App. 1989).

Finally, the Officers argue Dr. Whitehill's testimony is inadmissible because he did not treat, evaluate, or test Lyles, citing to State v. Johnson, 150 Wn. App. 663, 208 P.3d 1265 (2009). But Johnson does not support this argument. In that case, a defendant argued fetal alcohol spectrum disorder (FASD) impaired his ability to tell right from wrong. The trial court allowed a defense expert to testify in general as to how FASD generally impairs a sufferer's cognitive functioning but would not permit the expert to testify that Johnson's FASD precluded him from being able to tell right from wrong. The Supreme Court affirmed because the expert testified he had no knowledge as to how the defendant was affected by FASD and trial counsel told the court the expert would not offer such opinions. Id. at 676-77. The Supreme Court did not hold that an expert cannot opine on an individual's mental state unless he has personally examined that individual.

Fundamentally, the Officers' arguments about Dr. Whitehill's opinions go to the weight, and not the admissibility, of his testimony. Such considerations are not dispositive on admissibility under ER 702 or Frye.[10] See Pub. Util. Dist. No. 2 of Pac. County v. Comcast of Wash. IV, Inc., 8 Wn. App. 2d 418, 446, 438 P.3d 1212 (2019) (the credibility of expert witness testimony is best determined by the trier of fact). The trial court thus improperly excluded Dr. Whitehill's declaration.

The evidence of Lyles's psychological condition on the day of her death creates a genuine issue of material fact as to whether she had the capacity to form the

---

[10] At oral argument, the Officers further argued that the trial court appropriately excluded Dr. Whitehill's testimony because, as a Ph.D. and not an M.D., he was not qualified to give such an opinion. Dr. Whitehill's testimony, however, was not a medical opinion, but a psychological one. Furthermore, an attack on the academic degree held by a testifying expert assails the weight afforded the testimony, not its admissibility. State v. Weaville, 162 Wn. App. 801, 824-25, 256 P.3d 426 (2011).

requisite intent to commit felony assault or attempted murder, and the trial court erred in granting summary judgment on this issue.

C. Qualified Immunity

The Estate next argues it was entitled to summary judgment on the Officers' affirmative defense of qualified immunity. We disagree.

In a negligence action, an officer is entitled to qualified immunity when he or she (1) was carrying out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acted reasonably. Staats v. Brown, 139 Wn.2d 757, 778, 991 P.2d 615 (2000). The first Brown factor presents a question of law, while the second and third factors necessarily introduce a factual inquiry into the qualified immunity analysis under state law. See Lesley v. Dept. of Soc. & Health Servs., 83 Wn. App. 263, 275, 921 P.2d 1066 (1996) (summary judgment on qualified immunity reversed because questions of fact existed as to whether caseworker followed proper procedures in removing child from parental custody).

We conclude there are genuine questions of material fact as to whether Officer Anderson followed the proper procedures in responding to Lyles's actions and whether both officers acted reasonably in using lethal force against her.

The Estate first contends neither officer was carrying out a statutory duty when they responded to Lyle's report of a burglary. This is legally incorrect. Under RCW 10.93.070, police officers have the statutory authority to enforce state criminal laws. Responding to a 911 report of a possible crime is the execution of a police officer's statutory duties. The officers were in Lyles's apartment at her invitation and with her

- 15 -

consent. As a matter of law, they were carrying out a statutory duty when they interacted with her.

Next, the Estate argues that Officer Anderson violated SPD's stun gun policy by failing to carry his stun gun on patrol. This fact is undisputed. SPD policies mandate that any officer who has been trained and certified to carry a stun gun must do so during their shift. But that policy does not mandate that an officer use a stun gun when attacked by a knife-wielding subject, only that the stun gun be carried with them when on duty. If Officer Anderson had been carrying his stun gun at the time of the shooting, there remains a question of fact as to whether its use would have been appropriate under the circumstances. The Estate expert, D.B. Van Blaricom, testified a stun gun would have been appropriate as a nonlethal device to subdue Lyles. Jeff Noble, the Officers' police practices expert, testified that Lyles was such a short distance away from Officer Anderson that even had he deployed the stun gun, it would have been ineffective and would have put Anderson at risk of death or serious bodily injury. Noble testified that "a reasonable officer under the circumstances would not have drawn or attempted to use the Taser," because the stun gun has a low effectiveness rate, Lyles was wearing a heavy coat, and Officer Anderson was too close to her to ensure its efficacy

The Estate also maintains that both officers violated SPD use of force policies by not choosing less lethal methods of subduing Lyles, a small woman at 5' 3" and weighing just 100 pounds. SPD's use of force policies require that officers use only the degree of force that is objectively reasonable, necessary, and proportional to the threat of a subject and officers must use de-escalation tactics when circumstances

permit. Under Seattle Municipal Code § 3.28.115, a police officer is authorized to discharge a firearm at another person "when necessary to . . . [d]efend himself or another person from death or serious bodily injury." Under that same provision of the city code, "[a] police officer may not use a firearm unless all other reasonable alternatives have been exhausted or would appear to a reasonable police officer to be ineffective under the particular circumstances."

But there are genuine issues of material fact as to whether the Officers followed SPD use of force policies or Seattle code provisions regarding the discharge of a firearm. Noble opined that the Officers' use of deadly force was objectively reasonable, necessary, and proportional to Lyles' lethal threats. The Estate's experts, Maureillo and Van Blaircom, opined that the Officers did not act reasonably in using lethal force against Lyles, and the Officers had non-lethal options available to them, including stun guns or batons. Mauriello further testified using a firearm was also unreasonable due to the risk of hitting Lyles' children who were in close proximity.

The Estate contends the trial court erred in striking the declarations of Mauriello and Van Blaricom. We agree. First, the testimony of these experts addresses the reasonableness of the Officers' conduct in their interaction with Lyles, an issue relevant to the application of the Officers' qualified immunity defense.

Second, the expert opinions are admissible under both ER 702 and Frye. The Officers argue that the Estate's experts did not properly account for the factors defining the reasonableness of a law enforcement officer's use of force, as laid out in

Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).[11]  But

neither Mauriello nor Van Blaricom relied on an incorrect legal standard.  Mauriello

based his opinions on the following standard:

> The reasonableness of a particular use of force is based on the totality
> of circumstances known by the officer at the time of the use of force and
> weighs the actions of the officer against the rights of the subject, in light
> of the circumstances surrounding the event.  It must be judged from the
> perspective of a reasonable officer on the scene, rather than with the
> 20/20 vision of hindsight.

As the Officers concede on appeal, "Mauriello's declaration relies upon the Graham

standard."  They argue, however, that despite laying out this correct standard, he then

"expresses an opinion that does not account for the Graham factors and violates the

prohibition against assessing the reasonableness of force with the 20/20 vision of

hindsight."  This argument, however, does not challenge the legal standard Mauriello

applied.   It is instead an attack on the credibility of his conclusions.   A mere

disagreement with an expert's conclusions, based on methods generally accepted in

the relevant community, does not render expert witness evidence inadmissible under

ER 702.  Reese v. Stroh, 74 Wn. App. 550, 560, 874 P.2d 200 (1994).

As for Van Blaricom's testimony, the Officers contend he incorrectly relied on

the standard applicable to claims of professional negligence, rather than Graham.  But

Van Blaricom, like Mauriello, set out the same Graham standard for determining the

reasonableness of a police officer's use of force.   Van Blaricom, like Mauriello,

concluded that the actions of the Officers "were unreasonable."  Van Blaricom also

---

[11] The Graham standard relates to the reasonableness of a police officer's use of force under the Fourth Amendment in cases arising under 42 U.S.C. § 1983.  Under federal constitutional jurisprudence, the reasonableness of an officer's use of force is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  Graham, 490 U.S. at 397.

opined that the Officers "failed to exercise the degree of skill, care, diligence and learning that would be expected of a reasonable police officer in the State of Washington under the same or similar circumstances." But this opinion was in addition to his Graham analysis and was appropriate under the negligence standard set out in Beltran-Serrano, 193 Wn.2d at 550. Thus, the trial court erred in striking the Mauiello and Van Blaricom declarations.

The expert testimony here creates genuine issues of material fact as to whether the Officers are entitled to qualified immunity and the trial court did not err in denying the Estate's summary judgment motion on this issue.

D. Assumption of Risk

The Estate also argues the Officers' assumption of risk affirmative defense should have been dismissed because there is no evidence that Lyles assumed the risk of being killed by Officers Anderson and McNew and the trial court erred in denying summary judgment on the issue. We disagree.

Washington courts recognize four categories of assumption of risk: express, implied primary, implied unreasonable, and implied reasonable assumption of risk. Gregoire v. City of Oak Harbor, 170 Wn.2d 628, 636, 244 P.3d 924 (2010). Only the first two serve as an absolute defense; the latter two only serve as damage-reducing factors. Id. The parties agree that only implied primary assumption of risk applies to this case. To establish this affirmative defense, the Officers must prove that Lyles "(1) had full subjective understanding (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter the risk." Id.

The Officers presented evidence that Lyles had extensive history with the police, having called for their assistance some 23 times in the recent past. There is evidence she had previously threatened police officers in her apartment and had acknowledged, when they drew their firearms, that she might be shot for doing so. There is evidence she appeared to have intentionally armed herself with not one but two knives the day the Officers responded to her 911 call and she intentionally lunged at them, knowing the officers had their weapons drawn. A reasonable jury could find from this evidence that Lyles subjectively understood attempting to stab armed police officers with a knife carried a significant risk of being shot and voluntarily chose to encounter that risk.

But the Estate has presented evidence that Lyles was in a psychotic state and incapable of fully understanding the presence and nature of the risk posed by threatening Officer Anderson and McNew with a knife. Lyles's delusional statements and bizarre behavior may indicate that she did not fully appreciate the threat posed by the officers during that encounter. Dr. Whitehill testified Lyles's mental illness precluded her from voluntarily assuming the risk of her conduct.

Given this evidence, there are genuine issues of material fact and the trial court did not err in denying summary judgment on the issue of assumption of risk.

E. Discretionary Immunity

The Estate contends the trial court erred in refusing to dismiss the City's affirmative defense of discretionary immunity because it does not challenge any discretionary policy decision made by a high-level executive within the City. The City argues the Estate's position on appeal is new and was not the argument it advanced

before the trial court. We conclude the Estate did raise this argument below and the trial court erred in refusing to dismiss the City's affirmative defense.[12]

In its answer to the third amended complaint, the City pleaded the following affirmative defense: "Plaintiffs' claims may be barred in whole, or in part, by governmental immunity for discretionary, policy making, and/or judgmental functions and decisions." A governmental entity is entitled to immunity for "discretionary acts at a basic policy level." Chambers-Castanes v. King County, 100 Wn.2d 275, 282, 669 P.2d 451 (1983). "To fall within this exception, however, the discretionary act must not only involve a basic policy determination, but must also be the product of a considered policy decision." Id.

The Estate moved to dismiss this defense because "Defendant has failed to provide any evidence in support of this claim." In response, the City argued the Estate made various allegations about City policies and basic policy decisions and when it tried to determine which policies the Estate was challenging, the Estate would not identify them. In fact, the Estate represented during a discovery conference that it was not challenging any policies or procedures. The Estate argued in reply that "[the] City offers no evidence of high-level officials making considered policy decisions relevant here. There is no evidence in the record to support an Evangelical/King analysis," citing Evangelical United Brethren Church of Adna v. State, 67 Wn.2d 246, 407 P. 2d 440 (1965) and Chambers-Castanes, 100 Wn.2d at 275. The Estate's briefing before the trial court and the evidence the City presented—that the Estate

---

[12] The City indicated below that the Officers have not separately asserted a discretionary immunity defense.

was not challenging any City policy decision—demonstrates that the Estate's argument on appeal is not new. It is indeed the same argument advanced below.

Given that the Estate has disavowed any challenge to City policies, the discretionary immunity defense is inapplicable and should have been dismissed.[13]

## CONCLUSION

We reverse the summary judgment dismissal of the Estate's claims against the Officers because there are genuine issues of material fact on the Officers' affirmative defense under RCW 4.24.420. We affirm the trial court's denial of summary judgment as to the Officers' qualified immunity and assumption of risks defenses. We reverse the order denying the Estate's motion to dismiss the City's discretionary immunity defense. We remand for further proceedings consistent with this opinion.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._                    _Verellen, J._

---

[13] This conclusion is further supported by our Supreme Court's recent decision in Mancini v. City of Tacoma, No. 97583, slip op. at 23 (Wash. Jan. 28, 2021), holding that the doctrine of discretionary immunity has no bearing on cases that do not involve policy decisions made by a coordinate branch of government.