IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SINA GHODSEE, an individual, through Litigation Guardian ad Litem, JOSHUA BROTHERS, | ) ) ) ) | No. 82897-5-I |
| Appellant, | ) ) ) | DIVISION ONE |
| and | ) ) ) ) | PUBLISHED OPINION |
| SHAHRBANOO GHODSEE, an individual, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| CITY OF KENT, a political subdivision of the State of Washington, and KING COUNTY, d/b/a King County Crisis and Commitment Services, | ) ) ) ) ) | |
| Respondents. | ) ) ) | |

HAZELRIGG, J. — Sina Ghodsee appeals from an order granting summary judgment in favor of King County and the City of Kent. Ghodsee sued in negligence, alleging both government entities failed to exercise reasonable care in detaining him under the involuntary treatment act.[1] Ghodsee fails to meet his burden of raising a material issue of fact as to each of the essential elements of

---

[1] Ch. 71.05 RCW.

negligence or demonstrate that the entities were not entitled to statutory immunity. Accordingly, summary judgment dismissal was proper and we affirm.

FACTS

On Friday, June 23, 2017, Shahrbanoo Ghodsee[2] contacted King County Crisis and Commitment Services (KCCCS) with concerns about her son, Sina Ghodsee. Shahrbanoo reported Ghodsee was not taking his medication, was "agitated" and "delusional," and she had left the home to stay elsewhere. Four days later, a "Designated Mental Health Professional" (DMHP)[3] called to schedule an appointment for a team of DMHPs to meet with Shahrbanoo at the Ghodsee home. The DMHPs intended to interview Ghodsee pursuant to the involuntary treatment act (ITA), but were unsuccessful and eventually left the home after Ghodsee pointed "what appeared to be a table leg at [them] like a gun." They called the police; officers from the Kent Police Department (KPD) responded and attempted to make contact with Ghodsee, but were similarly unsuccessful and disengaged.[4] On Thursday, June 29, a DMHP filed a Petition for Initial Detention (Non-Emergency) in King County Superior Court, which the court granted.

On Friday, June 30 and again on Saturday, July 1, a team of DMHPs and several officers from KPD went back to the Ghodsee home but were ultimately unable to detain Ghodsee. On Sunday, July 2, KPD was dispatched to the

---

[2] Shahrbanoo is a plaintiff in the case but not a party to the appeal. We refer to her by her first name and her son, the appellant, as Ghodsee. No disrespect is intended.

[3] Subsequent amendments to the involuntary treatment act replaced the term "Designated Mental Health Professional," or DMHP, with "Designated Crisis Responders" (DCRs). This opinion uses the terminology applicable at the time of the events at issue.

[4] KPD reported Ghodsee swung a skateboard at them "like a bat" when an officer attempted contact.

Ghodsee home after a neighbor called law enforcement concerned that Ghodsee was threatening someone and possibly carrying a rifle. The caller could not state with any certainty that he saw a gun, and KPD never observed a crime, so the officers eventually left without attempting to contact Ghodsee. The next week, on Friday, July 7, KPD officers formulated a plan to take Ghodsee into custody when he left his home to get groceries or cigarettes. Around midnight on July 9, the manager at a local grocery store called KPD to inform them Ghodsee was on site, but by the time officers arrived Ghodsee had left.

On Monday, July 10, KPD received two emergency calls from Ghodsee's neighbors, reporting Ghodsee had shot at the neighbor's occupied home. KPD responded and saw Ghodsee in the window of his home with a rifle raised, pointed in the direction of the officers. Two officers simultaneously fired, and Ghodsee disappeared from sight. Officers on the scene used a drone to see inside of the home, where they observed Ghodsee laying on the floor. Ghodsee was taken into custody. He sustained a gunshot wound to the head, surviving but suffering significant and life-changing injuries.

On May 28, 2020, Ghodsee, through a litigation guardian ad litem, and Shahrbanoo filed a civil complaint against the City of Kent (City). They later amended their complaint to add King County (County), doing business as KCCCS, as a defendant. On May 21, 2021, both defendants moved for summary judgment dismissal on the basis of the public duty doctrine and claims of statutory immunity. The motion was heard on June 18, 2021. The trial court granted summary judgment for both defendants on July 8, 2021. Ghodsee timely appeals.

ANALYSIS

I.      Standard of Review

This court reviews a summary judgment order de novo, engaging "in the same inquiry as the trial court." Wallace v. Lewis County., 134 Wn. App. 1, 12, 137 P.3d 101 (2006). Like the trial court, this court "review[s] all evidence and reasonable inferences in the light most favorable to the nonmoving party," affirming if there are no genuine issues of material fact "and the moving party is entitled to judgment as a matter of law." Dalen v. St. John Med. Ctr., 8 Wn. App. 2d 49, 57, 436 P.3d 877 (2019). A genuine issue of material fact exists if reasonable minds could differ on facts which control the outcome of the proceeding. Id. at 58.

A negligence action contains four elements: (1) duty, (2) breach, (3) injury, and (4) proximate cause. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). "If any of these elements cannot be met as a matter of law, summary judgment for the defendant is proper." Id.

II.     Duty of Care and the Public Duty Doctrine

Ghodsee first argues both entities owed him a duty of care. He contends the County owed him (1) a "take charge duty" under the special relationship exception to the public duty doctrine, and (2) a duty to enforce the non-emergency detention order (NED) issued by the trial court. He asserts the City owed him a duty (1) to exercise reasonable care in discharging its responsibilities, and (2) to enforce the NED. This court reviews "the existence of a duty as a question of law" de novo. Washburn v. City of Fed. Way, 178 Wn.2d 732, 753, 310 P.3d 1275

(2013). Duty is a "threshold issue." Mita v. Guardsmark, LLC, 182 Wn. App. 76, 83, 328 P.3d 962 (2014).

In evaluating the duty of a governmental entity, we must also consider the public duty doctrine. Washburn, 178 Wn.2d at 753–54. To succeed in a negligence claim against a governmental entity, the plaintiff must demonstrate the government owed a duty to the individual plaintiff, rather than the public at large. Id. at 754. "[A] duty to all is a duty to no one." J & B Dev. Co. v. King County, 100 Wn.2d 299, 303, 669 P.2d 468 (1983) (overruled on other grounds by Meaney v. Dodd, 111 Wn.2d 174, 179–80, 759 P.2d 455 (1988)). While similar to sovereign immunity, the public duty doctrine uniquely "recognizes the existence of a tort, authorizes the filing of a claim against a [government entity] and also recognizes applicable liability subject to some limitations." Id. This differs from sovereign immunity, which denies all liability. Id.

There are several exceptions to the public duty doctrine, which are "used as 'focusing tools' to determine whether the public entity had a duty to the injured plaintiff." Taggart v. State, 118 Wn.2d 195, 218, 822 P.2d 243 (1992). The four exceptions are (1) legislative intent, (2) failure to enforce, (3) rescue doctrine, and (4) special relationship. Beltran-Serrano v. City of Tacoma, 193 Wn.2d 537, 549 n.7, 442 P.3d 608 (2019); [5] see also Cummins v. Lewis County, 156 Wn.2d 844, 853 n.7, 133 P.3d 458 (2006).

---

[5] Beltran-Serrano noted the public duty doctrine does not lessen the government's duty of reasonable care in direct interactions with others, specifically law enforcement's "duty to refrain from directly causing harm to another through affirmative acts of misfeasance." Id. at 550.

A.     Whether the County Has a Duty Based on a Special Relationship

Ghodsee first argues the County owed him an individualized duty akin to the take charge duty or provider-patient special relationship exception to the public duty doctrine.  He specifically alleges the language and posture of the NED order created a take-charge-like relationship between Ghodsee and the DMHPs.[6]

Under the Restatement (Second) of Torts § 315 (Am. Law Inst. 1965), there is generally no duty to prevent a third party from harming another.  If, however, "a special relation exists between the actor and the third person," there may be a duty to "control the third person's conduct."  Id.  One such special relationship arises when an actor "takes charge of a third person whom [they] know or should know to be likely to cause bodily harm to others if not controlled," creating "a duty to exercise reasonable care."  Id. at § 319.  Our courts have held "this duty extends to self-inflicted harm."  Gregoire v. City of Oak Harbor, 170 Wn.2d 628, 639, 244 P.3d 924 (2010).  Our courts have recognized a special relationship, separate from a take charge duty, between mental health providers and patients under § 315 of the Restatement.  See Petersen v. State, 100 Wn.2d 421, 426–27, 671 P.2d 230 (1983).

In Estate of Davis v. Department of Corrections, the Washington State Supreme Court considered whether there was a special relationship between an

---

[6] The respondents argue this issue is not properly before this court because it was not raised in the trial court. This court only considers issues raised on summary judgment before the trial court "to ensure that we engage in the same inquiry as the trial court." Kave v. McIntosh Ridge Primary Rd. Ass'n, 198 Wn. App. 812, 823, 394 P.3d 446 (2017). However, Ghodsee did argue duty based on the special relationship exception before the superior court and the record provided is sufficient for us to consider this issue. See Turner v. Dep't of Soc. & Health Servs., 198 Wn.2d 273, 293 n.15, 493 P.3d 117 (2021) (citing RAP 2.5(a) (court reached an issue not brought before the trial court on summary judgment)).

individual on community custody and a mental health counselor who conducted "an initial assessment" to evaluate whether counseling would be beneficial to the person under supervision by the Department of Corrections. 127 Wn. App. 833, 837, 113 P.3d 487, 491 (2005). The court found there was no special relationship because the counselor met with the individual "only one time," to provide an initial assessment. Id. at 842. This brief interaction was "not a definite, established, and continuing relationship that would trigger a legal duty." Id.

Our Supreme Court then reviewed whether there was a special relationship between a mental health professional and patient in Volk v. DeMeerleer. There, the court held a psychiatrist and their outpatient client had a nine-year relationship which triggered a duty under § 315 of the Restatement. Volk, 187 Wn.2d 241, 274, 386 P.3d 254 (2016). More recently in Konicke v. Evergreen Emergency Services, P.S., this court analyzed the existence of a special relationship between a patient and an emergency health provider. We found there was no "definite, established, and continuing" relationship where the patient made a single visit to the emergency room. 16 Wn. App. 2d 131, 138, 480 P.3d 424 (2021) (quoting Volk, 187 Wn.2d at 256).

The statutory role of the DMHP, now "Designated Crisis Responder" (DCR), is to investigate and evaluate information, determine whether to file a petition for initial detention or involuntary outpatient evaluation, and personally interview the individual to determine if they will voluntarily receive evaluation and treatment. See former RCW 71.05.150 (2015), amended by LAWS of 2016, ch. 29 § 211. Even viewing the evidence in the light most favorable to Ghodsee, there was no definite,

established, and continuing relationship here. The first indirect interaction the DMHPs had with Ghodsee was on June 23, when Shahrbanoo contacted KCCCS. A DMHP team attempted to conduct an initial assessment on June 28 but never made direct contact with Ghodsee. After the DMHPs heard yelling inside and saw Ghodsee holding "something" that looked like a rifle in an upstairs window, they left. Based on the information available to the DMHPs through those limited interactions, the County filed a petition for non-emergency detention the next day, June 29, but did not attempt to make contact with Ghodsee. The DMHP team next had limited interaction with Ghodsee on June 30, when they accompanied KPD to the home in an attempt to effectuate the NED order. They did not make direct contact. The DMHPs returned again on July 1, with police, but again did not make direct contact with Ghodsee due to safety concerns. After that date, the DMHPs never returned to the home or made direct contact with Ghodsee at any point prior to the shooting.

Based on the statutory role of DMHPs, now DCRs, and the actions of the specific DMHPs at issue here, there was no continuing, definite, and established relationship giving rise to a legal duty. The DMHP-potential detainee relationship is more akin to a patient and emergency room provider (Konicke) or a client and mental health provider in the context of an initial assessment (Davis), and less similar to a nine-year outpatient therapeutic relationship between a psychiatrist and patient (Volk). If the DMHPs had any direct contact with Ghodsee, their role would have been limited to conducting an investigation and filing a petition for detention if they felt it was called for. See former RCW 71.05.150. Viewing the facts in the

- 8 -

light most favorable to Ghodsee as we must when reviewing an order on summary judgment, the period of time during which the DMHPs were tangentially involved with Ghodsee was brief, lasting only from June 23 until July 10. This differs starkly from cases where our courts have found a special relationship.

The limited role of the DMHP as defined by statute, and the brief relationship between Ghodsee and the specific DMHPs at issue here, does not rise to the level of a "definite, established, and continuing relationship" to support a legal duty within the framework of the public duty doctrine.

B.      Whether the County or City Has a Duty Under the NED Order

In analyzing whether a "take charge" duty under § 319 of the Restatement exists, we first look to the nature of the relationship. Davis, 127 Wn. App. at 842. In Davis, the court held "[t]he two most important considerations are the court order placing the corrections officer in charge and the statutes giving the officer the power to act." Id. Our courts have applied this duty in the context of "various types of community supervision programs," including the duties of community corrections officers, city probation counselors, county pretrial release counselors, and county probation officers. See Harper v. State, 192 Wn.2d 328, 342, 429 P.3d 1071 (2018) (internal citations omitted). Ghodsee asks us to extend the application of this type of duty outside the context of corrections or community supervision based on the NED order.

Ghodsee argues the language of the NED order created a take charge duty by directing DMHPs and KPD to detain him. However, we consider a court order and statutory authority to act. See Davis, 127 Wn. App. at 842, see also Miller v.

Pierce County, No. 53344-8-II (Wash. Ct. App. Feb. 9, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2053344-8-II%20Unpublished%20Opinion.pdf (county owed a duty under its statutory authority to confine an individual "and the court's order requiring it to do so" pursuant to a judgment and sentence).[7] Former RCW 71.05.150(4) only grants DMHPs authority to "notify a peace officer to take such person or cause such person to be taken into custody." They have no statutory authority nor statutory mandate to physically detain an individual themselves. Rather the statute is clear that they "may notify" a peace officer to take an individual into custody. See Id.

The language of the NED order is similarly clear. The superior court found Ghodsee "presents a likelihood of serious harm to others," but did not find he presented a likelihood of harm to himself. The court ordered that Ghodsee "shall be detained by a [DMHP]" and further ordered "any peace officer shall take the respondent into custody." Washington case law has consistently held "'that the word "shall" in a statute is presumptively imperative and operates to create a duty.'" In re Dependency of T.P., 12 Wn. App. 2d 538, 548, 458 P.3d 825 (2020) (quoting In re Parental Rights to K.J.B., 187 Wn.2d 592, 601, 387 P.3d 1072 (2017)). Likewise, the plain language of the court order directing the government to detain Ghodsee creates a legal duty. However, this duty is one owed to the public at large, not an individual duty owed to Ghodsee. See Osborn v. Mason County, 157 Wn.2d 18, 28, 134 P.3d 197 (2006) ("County has a 'duty' to protect its citizens in

---

[7] We may utilize unpublished opinions when "necessary for a reasoned decision." GR 14.1(c). Miller provides a helpful analysis of duty in the context of a court order.

a colloquial sense, but it does not have a <u>legal</u> duty to prevent every foreseeable injury.").

For example, in <u>Miller</u>, the County had a duty to an individual under the special relationship and take charge doctrines where the County was authorized by statute to confine an offender pursuant to a criminal conviction and a superior court "order required the County to ensure Robinson reported for [electronic home monitoring] or reported to the jail on August 5, 2016." No. 53344-8-II, slip. op. at 7 (analyzing dismissal of a complaint under CR 12(b)(6)). A critical factual distinction from the case before us is that Miller was ordered remanded to the custody of the county pursuant to a felony judgment and sentence and accompanying warrant of commitment. <u>Id.</u> at 2–3. In contrast, the NED order did not direct any specific law enforcement agency to detain Ghodsee, nor did it dictate any particular date or mechanism for detaining Ghodsee.

In evaluating a take charge relationship, the inquiry is specific to "the relationship" between the government actor and tortfeasor.[8] <u>Hertog, ex rel. S.A.H. v. City of Seattle</u>, 138 Wn.2d 265, 279, 979 P.2d 400 (1999). <u>Hertog</u> analyzed the relationship between a pre-trial probation officer and probationer, holding that because the probation officer "is clearly in charge of monitoring the probationer [ ] and has a duty to report violations to the court," there is a take charge duty. <u>Id.</u> The probation officer-probationer relationship differs significantly from an officer ordered to detain an individual under the ITA. There is no ongoing, monitoring

---

[8] Our courts have held this duty includes protection from self-inflicted harm. <u>Gregoire</u>, 170 Wn.2d at 639. Ghodsee alleges the County and City had a duty to protect him from self-inflicted harm under the take charge duty.

relationship and no duty to report actions to the court. In a probation officer-probationer relationship, "two of the most important features" are a court order placing an offender "on the supervising officer's caseload and the statutes that describe and circumscribe the officer's power to act." Couch v. Dep't of Corr., 113 Wn. App. 556, 565, 54 P.3d 197 (2002). This individualized responsibility differs from the general language in the NED order, and there is no similar language in the order or in the ITA that "describe[s] and circumscribe[s]" how the officers may act in effectuating the detention order. Id.

There are three historical purposes underlying the public duty doctrine: (1) preventing excessive liability for government entities, (2) avoiding "hindering the governing process," and (3) providing "a mechanism for focusing" the element of duty. J & B Dev. Co., 100 Wn.2d at 304. This doctrine balances the rights of an injured plaintiff with the need to limit governmental liability "[b]ecause governments, unlike private persons, are tasked with duties that are not legal duties within the meaning of tort law." See Washburn, 178 Wn.2d at 753, see also Osborn, 157 Wn.2d at 28 ("the public duty doctrine helps us distinguish proper legal duties from mere hortatory 'duties.'").

Ghodsee bears the burden to demonstrate the government owed him an individual duty, rather than a duty to the public at large, in order to survive summary judgment. Viewing the facts in the light most favorable to Ghodsee, he fails to show an actionable duty based on the NED order as to either the County or the City. For this reason, his negligence claim fails as a matter of law.

C.    Law Enforcement Duty of Care

Ghodsee also argues KPD breached its duty of reasonable care in its direct interaction with him by failing to detain him more swiftly after the NED order was issued.  His claim is essentially that, had he been detained sooner, he would not have been shot by KPD or suffered the serious injuries that resulted from the shooting.  Generally, "'every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interaction with others,'" including law enforcement officers.  Mancini v. City of Tacoma, 196 Wn.2d 864, 879, 479 P.3d 656 (2021) (quoting Beltran-Serrano, 193 Wn.2d at 550).  Washington case law has held this duty applies in direct interactions with individuals.  See, e.g., Watness v. City of Seattle, 16 Wn. App. 2d 297, 307, 481 P.3d 570 (2021) ("an officer owes a legal duty to exercise reasonable care when engaging in affirmative conduct toward others.") (emphasis added)); Robb v. City of Seattle, 176 Wn.2d 427, 439, 295 P.3d 212 (2013) ("In order to properly separate conduct giving rise to liability from other conduct, courts have maintained a firm line between misfeasance and nonfeasance.").

Police have a duty to exercise reasonable care when discharging their duties, including effectuating court orders.  See Mancini, 196 Wn.2d at 880.  This necessarily includes the exercise of discretion by law enforcement as to how to effectuate those court orders.  There is nothing in statute or in the NED order that required KPD to enforce the detention order in any particular way; the officers had discretion to determine the safest way to carry out the court's order.  Their actions in effectuating the NED order were further constrained by various constitutional

- 13 -

considerations that necessitate a flexible response based on the particular circumstances of the interaction.

In Konicke, this court declined to recognize a claimed duty for emergency healthcare providers to detain patients under the ITA in part because it would "seriously undermine[] the legislative goal of safeguarding the individual rights of such patients." 16 Wn. App. 2d at 144. Likewise, finding legal liability on the part of a governmental entity based on detaining an individual would also seriously undermine this legislative goal. In Robb, our Supreme Court discussed the distinction in tort law between misfeasance and nonfeasance, holding that where officers "did not affirmatively create a new risk," the act was nonfeasance and did not give rise to liability. 176 Wn.2d at 437–39. To hold otherwise would lead to "an unpredictable and unprecedented expansion of . . . liability." Id. at 439.

As Konicke noted, "chapter 71.05 RCW was not enacted for the particular benefit of third parties injured by people suffering from serious behavioral health disorders but, rather, for the benefit of people with behavioral health disorders themselves." 16 Wn. App. 2d 140–41. While the legislative intent of the statute includes "'protect[ing] public safety through use of the parens patriae and police powers of the state,'" applying broad liability "runs counter to the statutory scheme, which specifically limits liability for the detention decisions made by emergency healthcare providers" and government actors. Id. at 143 (quoting RCW 71.05.010). Additional legislative intent expressed in former RCW 71.05 is preventing inappropriate or indefinite commitment, safeguarding individual rights,

- 14 -

and providing continuity of care.[9]  Allowing for broad liability of government entities does not support any of these purposes, and as this court noted in Konicke, expanding liability seriously undercuts the purpose of safeguarding individual rights.

To expand liability of a law enforcement agency based on failure to detain pursuant to the ITA or a NED order in a particular way or within a particular timeframe would undermine the very language of the ITA itself, which seeks to safeguard individual rights.  The risk that imposing liability "could encourage" law enforcement "to detain patients merely to avoid potential liability to third parties," presents a significant challenge to the individual rights of potential detainees who are protected under the ITA.  See Id. at 144.

Importantly, the NED order only ordered Ghodsee to be detained by law enforcement.  Exercising reasonable care, particularly in the constantly evolving circumstances of a mental health crisis, necessitated discretion on the part of police in terms of how that order would be carried out.  The existence of the NED did not suspend Ghodsee's right to privacy in his home, for example, or to be free from search or seizure in the absence of either a warrant or applicable exception to state and federal warrant requirements.[10]  While a neighbor reported Ghodsee "was threatening some unknown individual and had a gun," when officers responded, the neighbor admitted he did not see Ghodsee "directly threatening

---

[9] The statements of legislative intent expressed in the former version of RCW 71.05.010, applicable at the time of the incident, are identical to those expressed in the current version discussed in Konicke.

[10] "Officers must have a warrant or a well-established exception to the warrant requirement before intruding into a home." City of Shoreline v. McLemore, 193 Wn.2d 225, 226 (2019).

anyone nor could he be sure he saw a firearm." The City argues that no exception to the warrant requirement applied, as there was no probable cause that a crime had occurred which would have been a prerequisite to arresting Ghodsee[11] on that date and there were no exigent circumstances to justify entering the home.[12] Contrary to Ghodsee's assertion, the NED order does not function as a warrant or otherwise suspend Ghodsee's individual rights protected by warrant requirements and other constraints on the actions of law enforcement.

Viewing the evidence in the light most favorable to Ghodsee, he fails to demonstrate that the City owed him a duty beyond the exercise of reasonable care, or that there exists a material issue of fact as to this claim, and summary judgment in favor of the City is proper.

III.     Whether the County or City Is Entitled to Immunity Under Former RCW 71.05.120

Ghodsee next alleges the trial court erred in finding that both government entities had immunity under former RCW 71.05.120. (Laws of 2016, ch. 29 § 208). He concedes the statute applies to the County's "belated decision to detain Sina," but asserts that it does not apply to its actions "in the execution of the detention order." Ghodsee argues he raised a material question of fact as to whether the County was grossly negligent sufficient to defeat any claim of statutory immunity.

---

[11] Probable cause alone is not sufficient for a warrantless search, but may support an arrest, which in turn supports a search incident to arrest. State v. Tibbles, 169 Wn.2d 364, 369, 236 P.3d 885 (2010); State v. Salinas, 169 Wn. App. 210, 216, 279 P.3d 917 (2012).

[12] "The exigent circumstances exception to the warrant requirement applies where 'obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape[,] or permit the destruction of evidence.'" Tibbles, 169 Wn.2d at 370 (internal quotation marks omitted).

For both entities, Ghodsee contends the statute is inapplicable because the allegedly negligent acts were unrelated to the "decision of whether to . . . detain" Ghodsee as the superior court had already made that decision when it signed the NED order.  Former RCW 71.05.120 states:

> (1) No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency, nor any public official performing functions necessary to the administration of this chapter, nor peace officer responsible for detaining a person pursuant to this chapter, nor any designated crisis responder, nor the state, a unit of local government, an evaluation and treatment facility, a secure detoxification facility, or an approved substance use disorder treatment program shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence.

The statutory language addresses detention, but also expressly includes a variety of other duties—admitting or discharging a patient, releasing a patient, and administering medication.  Id., see also Konicke, 16 Wn. App. 2d at 145–46.  These duties are more than mere mental decisions, but encompass the acts taken to effectuate those decisions.  Potential civil liability does not only arise from the choice to administer medications or detain an individual, but also the acts taken to carry out those decisions.  To hold otherwise would result in an unlikely or illogical outcome.  "We interpret statutes to avoid unlikely, strained, or absurd consequences."  Michel v. City of Seattle, 19 Wn. App. 2d 783, 792, 498 P.3d 522 (2021).  And while, as Ghodsee notes, we do "generally construe statutory immunities narrowly," if "the plain meaning is unambiguous, statutory construction

- 17 -

is inappropriate." Leishman v. Ogden Murphy Wallace, PLLC, 196 Wn.2d 898, 906, 479 P.3d 688 (2021).[13] The statute uses the phrases "performing functions" and "performing duties," which clearly intends to capture actions taken "with regard to" the decisions made as to detention and treatment of a person under the ITA. The plain meaning of the statute is unambiguous.

Because the plain language of the statute provides immunity for actions as well as decision-making, both the City and County are entitled to statutory immunity for their actions "with regard to" the decision to detain and Ghodsee must demonstrate gross negligence in order to overcome immunity. However, because Ghodsee fails to demonstrate either entity owed him an individualized duty of care as a matter of law, we need not reach the issue of gross negligence. To survive summary judgment, Ghodsee must raise a material issue of fact as to all four elements of negligence: duty, breach, damage and causation. Because the failure to meet his burden on the element of duty is fatal to his claim, we need not review the other elements.[14]

---

[13] Per Montoya-Lewis, J., with three justices concurring and one justice concurring separately.

[14] The City dedicated a portion of its brief, and its oral argument, to the felony defense to Ghodsee's excessive force and assault claims. RCW 4.24.420 provides a "complete defense" to an action against law enforcement for personal injuries or death if the injured person "was engaged in the commission of a felony at the time." The trial court found Ghodsee's excessive force and assault claims (Cause of Action V) were barred under RCW 4.24.420. Ghodsee does not assign error to this decision, and states explicitly he is not advancing his excessive force argument on appeal.

While Ghodsee's reply brief contains a heading stating "Trial Court Erred in Applying the Felony Defense," RCW 4.24.420 was applied only to the excessive force and assault claims, which Ghodsee concedes he is not appealing. The City likewise does not assign error to the trial court's limitation of RCW 4.24.420 to assault and excessive force. As such, we decline to reach the merits of this issue.

Ghodsee suffered immense injuries as a result of a devastating situation. He survived a gunshot wound to the head, but suffered a traumatic brain injury and severe cognitive impairments. He may never regain full independence. We acknowledge that Ghodsee and his family have suffered, and we are aware that by affirming the trial court, his civil claim is dismissed. We, however, also recognize that responding to mental health crises necessarily requires flexibility and individualized responses.

Our state legislature has made clear that officers must retain discretion as they interact with individuals in our communities so that they may be appropriately responsive to the circumstances presented to them. SUBSTITUTE H.B. 1735, 67th Leg., Reg. Sess. (Wash. 2022).[15] The law recognized that specific de-escalation tactics "[d]epend[] on the circumstances," (Section 2), but also clarifies that physical force may still be used in certain circumstances, including in detaining an individual under the ITA. Our legislature has also implemented crisis intervention training requirements for law enforcement officers. See RCW 43.101.427. There are crucial policy reasons, including the very nature of mental health crises and de-escalation, to empower agencies to adapt and respond to each unique situation as it unfolds. Our legislature has directed that agencies must be able to work responsively, and be able to prioritize de-escalation. Even in amending RCW 10.120.020, the legislature acknowledged that the statute "represents national

---

[15] We recognize this law, passed in 2022, was inapplicable at the time of the incident. However, Ghodsee submitted the session law, in its entirety, to this court as an additional authority under RAP 10.8. While he urged this court to focus on sections 3(1)(d), 3(1)(f) and 3(5)(a)-(b), we would be remiss if we ignored the other sections which assist in our analysis. We cite to this law for its persuasive value as it sheds light on how our legislature navigates issues of de-escalation by law enforcement agencies.

best practices." SUBSTITUTE H.B. 1735. Washington statute requires law enforcement officers to "[w]hen possible, use all de-escalation tactics that are available and appropriate under the circumstances before using physical force." RCW 10.120.020(3)(a).

When KPD made direct contact with Ghodsee on June 28, he responded in a threatening manner and the officer implemented the de-escalation technique of shielding by retreating from the home and closing the door between himself and Ghodsee. Ghodsee's argument that the officer should have been more aggressive in that moment so that the detention could have been completed, and thus avoiding the tragic shooting days later, runs counter to the clear policy considerations of our legislature. Officers must be empowered to continue utilizing de-escalation techniques whenever possible, as "best practices." The court did not err in granting summary judgment in favor of both the City and County.[16]

Affirmed.

WE CONCUR:

_____

Andrus, A.C.J.

_____

_____

---

[16] On February 22, Ghodsee filed a Statement of Additional Authorities with this court. The City objected, arguing this court should decline to consider authorities which were published before Ghodsee's reply brief was submitted. The City is correct that the purpose of RAP 10.8 "is to provide parties with an opportunity to bring to the court's attention cases decided after the parties submitted their briefs." See Gull Indus., Inc. v. Granite State Ins. Co., 18 Wn. App. 2d 842, 857 n.11, 493 P.3d 1183 (2021). However, had the authorities been brought to the attention of this court at oral argument, we would have properly considered them and we consider the authorities insofar as they are helpful in reaching our decision.